## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EDWARD TANSEY, Derivatively on Behalf of MODUSLINK GLOBAL SOLUTIONS, INC., | ) ) ) ) | Civil Action No. 12-cv-11399 |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JOSEPH C. LAWLER, STEVEN G. CRANE, FRANCIS J. JULES, VIRGINIA G. BREEN, MICHAEL J. MARDY, EDWARD E. LUCENTE, JEFFREY J. FENTON, JOSEPH M. O'DONNELL, WILLIAM R. MCLENNAN, THOMAS H. JOHNSON, and ANTHONY J. BAY, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| MODUSLINK GLOBAL SOLUTIONS, INC., a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | DEMAND FOR JURY TRIAL |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

## NATURE OF THE ACTION

1.     This is a verified shareholder derivative action brought by plaintiff on behalf of nominal defendant ModusLink Global Solutions, Inc. ("ModusLink" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs resulted in damages to ModusLink's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to tens of millions of dollars in potential liability for violations of state and federal law.

2.     ModusLink, formerly CMG Information Services, Inc. ("CMGI"), is an American technology and venture capital company, headquartered in Waltham, Massachusetts.  The Company supplies a range of internet and communications services, mostly to computer companies.  ModusLink's revenues are primarily derived from the sale of supply chain management services performed for its clients, and in fiscal year 2011, the Company's ten largest customers accounted for approximately 73% of its consolidated net revenue.

3.     Despite the importance of the Company's customer base to its business prospects, the Individual Defendants (as defined herein) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.  The truth behind the Company's business health and the Individual Defendants' wrongdoing began to emerge on the morning of June 11, 2012, when the Company disclosed through a press release that it was the subject of an U.S. Securities and Exchange Commission ("SEC") inquiry into its accounting and financial reporting practices.  In response to the inquiry from the SEC regarding the Company's treatment of rebates associated with volume discounts provided by vendors, the Audit Committee of the Company's Board of Directors (the "Board") initiated an internal investigation, which determined that "certain" client contracts have not been aligned consistently with ModusLink's practice of retaining volume discounts. The Audit Committee also identified "limited instances" where vendor costs incurred were "marked-up" to clients in a manner not consistent with client contracts.  In substance, the Individual Defendants cryptically admitted to overcharging their customers.

4.      The press release further stated that the Company believes it is no longer able to conclude that amounts from such volume discounts and mark-ups were correctly accounted for as revenue. Therefore, the Company announced that it expects to restate its audited financial statements from fiscal years 2009 through 2011, as well as the first two quarters of fiscal 2012 and its unaudited selected financial data for fiscal years 2007 and 2008, admitting that the previously issued financial statements "***should no longer be relied upon***."  Due to the Individual Defendants' failure to implement adequate internal controls and the Company's resulting "***material weakness in its internal control over financial reporting***," the Company must restate almost five years' worth of improper accounting and financial reporting that are not in accordance with Generally Accepted Accounting Principles ("GAAP").

5.      In the midst of the truth being revealed regarding the Individual Defendants' wrongdoing and the resulting liabilities faced by the Company, the June 11, 2012 press release also revealed that the Company's President and Chief Executive Officer ("CEO"), defendant Joseph C. Lawler ("Lawler"), would be stepping down and also relinquishing his seat on the Board, effective immediately.   In addition, the press release announced the departure of defendant William R. McLennan ("McLennan"), President of Global Operations.

6.      The revelations made in the June 11, 2012 press release caused ModusLink's market capitalization to plunge 35%, erasing more than $65 million in market capitalization in a single day.  As a direct result of the Individual Defendants' wrongdoing, the Company is now the subject of multiple federal securities class action lawsuits (the "Securities Class Actions") filed in the U. S. District Court for the District of Massachusetts on behalf of investors who purchased ModusLink's shares.  The Securities Class Actions pose the risk of tens of millions of dollars in damages to the Company.  This is in addition to the liability faced by the Company as a result of its potential breaches of contract with its customer base and the corporate waste caused by certain of the Individual Defendants' authorization for the Company to purchase over $56 million of its own shares at artificially inflated prices.

7.      Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) ModusLink maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to ModusLink occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**Plaintiff**

11.      Plaintiff Edward Tansey was a shareholder of ModusLink at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current ModusLink shareholder.  Plaintiff is a citizen of Maine.

**Nominal Defendant**

12.      Nominal Defendant ModusLink is a Delaware corporation with it principal place of business located at 1601 Trapelo Road, Waltham, Massachusetts.  Accordingly, ModusLink is a citizen of Delaware and Massachusetts.  ModusLink is a leader in global supply chain business

- 3 -

process management, serving technology-based clients in approximately fifteen countries. Through its wholly owned subsidiaries, ModusLink Corporation, ModusLink PTS, Inc., and Tech for Less LLC, ModusLink designs and executes global supply chain and e-Business strategies that purportedly drive revenue growth, reduce cost, and enhance the customer brand experience for the world's leading technology and consumer goods companies.

**Defendants**

13.     Defendant Lawler is ModusLink's President and CEO and has been since August 2004.  Lawler was also a ModusLink director from August 2004 to June 2012 and Chairman of the Board from August 2006 to November 2011.   Pursuant to a Separation and Release Agreement between Lawler and ModusLink, entered into and effective June 11, 2012, Lawler will continue to serve as ModusLink's President and CEO until the earlier of the date that:  (i) the Company appoints a new President and CEO; (ii) October 1, 2012; or (iii) the Company terminates his employment.  Lawler is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").   Lawler knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms. ModusLink paid Lawler the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $645,000 | $254,800 | $294,000 | - | $168,927 | $1,362,727 |
| 2010 | $645,000 | $988,600 | $233,384 | $974,337 | $16,755 | $2,858,076 |
| 2009 | $645,000 | $562,100 | $331,864 | - | $13,488 | $1,552,452 |
| 2008 | $639,808 | $562,100 | $457,999 | - | $37,583 | $1,697,490 |

Lawler is a citizen of Massachusetts.

14.     Defendant Steven G. Crane ("Crane") is ModusLink's Chief Financial Officer ("CFO") and has been since April 2007.  Crane was also ModusLink's Treasurer from April 2007 to June 2008.  Crane is named as a defendant in the Securities Class Actions that allege he

violated sections 10(b) and 20(a) of the Exchange Act.  Crane knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.  ModusLink paid Crane the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $400,000 | $152,880 | $117,600 | - | - | $670,480 |
| 2010 | $400,000 | $221,770 | $69,000 | $366,860 | $16,615 | $1,074,245 |
| 2009 | $400,000 | $225,540 | $108,000 | - | $13,474 | $747,014 |
| 2008 | $396,731 | $257,400 | $114,600 | - | $18,836 | $787,567 |

Crane is a citizen of Massachusetts.

15.     Defendant Francis J. Jules ("Jules") is ModusLink's Chairman of the Board and has been since November 2011 and a director and has been since February 2003.  Jules was also ModusLink's Presiding Director from August 2006 to November 2011.  Jules is a member of ModusLink's Audit Committee and has been since at least November 2006.  Jules knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices.  ModusLink paid Jules the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $106,500 | $79,998 | - | $186,498 |
| 2010 | $97,000 | $24,750 | - | $121,750 |
| 2009 | $92,000 | - | $13,429 | $105,429 |
| 2008 | $89,500 | - | $38,882 | $128,382 |

Jules is a citizen of Illinois.

16.     Defendant Virginia G. Breen ("Breen") is a ModusLink director and has been since April 2001.  Breen is also a member of ModusLink's Audit Committee and has been since at least October 2010.  Breen knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices.  ModusLink paid Breen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $83,250 | $79,998 | - | $163,248 |
| 2010 | $78,833 | $24,750 | - | $103,583 |
| 2009 | $80,000 | - | $13,429 | $93,429 |
| 2008 | $82,000 | - | $23,096 | $105,096 |

Breen is a citizen of New Jersey.

17.     Defendant Michael J. Mardy ("Mardy") is a ModusLink director and has been since May 2003.  Mardy is also Chairman of ModusLink's Audit Committee and has been since at least November 2006.  Mardy knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices.  ModusLink paid Mardy the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $92,500 | $79,998 | - | $172,498 |
| 2010 | $83,500 | $24,750 | - | $108,250 |
| 2009 | $84,000 | - | $13,429 | $97,429 |
| 2008 | $84,500 | - | $53,797 | $138,297 |

Mardy is a citizen of New Jersey.

18.     Defendant Edward E. Lucente ("Lucente") is a ModusLink director and has been since April 2006.   Lucente knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices. ModusLink paid Lucente the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $90,500 | $79,998 | - | $170,498 |
| 2010 | $79,667 | $24,750 | - | $104,417 |
| 2009 | $69,000 | - | $51,155 | $120,155 |
| 2008 | $67,000 | - | $60,698 | $127,698 |

Lucente is a citizen of Florida.

19.     Defendant Jeffrey J. Fenton ("Fenton") is a ModusLink director and has been since November 2010.   Fenton knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.   ModusLink paid Fenton the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $55,083 | $79,998 | $60,400 | $195,482 |

Fenton is a citizen of Pennsylvania.

20.     Defendant Joseph M. O'Donnell ("O'Donnell") is a ModusLink director and has been since November 2010.  O'Donnell is also a member of ModusLink's Audit Committee and has been since at least December 2011.  O'Donnell knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the

accuracy of the Company's financial reporting; and (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms. ModusLink paid O'Donnell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $56,000 | $79,998 | $60,400 | $196,398 |

O'Donnell is a citizen of Florida.

21.    Defendant McLennan was ModusLink Corporation's President, Global Operations from June 2008 to June 2012; President, International Business Unit from January 2006 to June 2008; and President, Asia-Pacific Operations from February 2005 to January 2006.  McLennan knowingly, recklessly, or with gross negligence: (i) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (ii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.  ModusLink paid McLennan the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2011 | $450,000 | $152,880 | $117,600 | - | $75,248 | $795,728 |
| 2010 | $450,000 | $272,950 | $69,000 | $461,273 | $49,124 | $1,302,347 |
| 2009 | $450,000 | $159,900 | $72,000 | - | $70,398 | $752,298 |
| 2008 | $402,139 | $765,750 | $226,350 | - | $316,414 | $1,710,653 |

McLennan is a citizen of Massachusetts.

22.    Defendant Thomas H. Johnson ("Johnson") was a ModusLink director from April 2006 to January 2012.  Johnson was also a member of ModusLink's Audit Committee from at least November 2006 to at least October 2009.  Johnson knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices.  ModusLink paid Johnson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2011 | $89,500 | $79,998 | - | $47,800 | $217,298 |
| 2010 | $78,167 | $24,750 | - | $15,000 | $117,917 |
| 2009 | $71,500 | - | $51,155 | - | $122,655 |
| 2008 | $69,500 | - | $60,698 | - | $130,198 |

Johnson is a citizen of Georgia.

23.     Defendant Anthony J. Bay ("Bay") was a ModusLink director from September 2002 to December 2010. Bay was also a member of ModusLink's Audit Committee from at least November 2006 to December 2010.  Bay knowingly or recklessly: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; (iii) failed to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms; and (iv) authorized and implemented multiple improper repurchases of the Company's stock at artificially inflated prices. ModusLink paid Bay the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Option Awards | Total |
|---|---|---|---|---|
| 2011 | $43,750 | - | - | $43,750 |
| 2010 | $77,500 | $24,750 | - | $102,250 |
| 2009 | $81,000 | - | $14,454 | $95,454 |
| 2008 | $82,000 | - | $23,972 | $105,972 |

Bay is a citizen of Washington.

24.     The defendants identified in ¶¶13-14, 21 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶13, 15-20, 22-23 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15-17, 20, 22-23 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶13-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

25.     By reason of their positions as officers, directors, and/or fiduciaries of ModusLink and because of their ability to control the business and corporate affairs of ModusLink, the Individual Defendants owed and owe ModusLink and its shareholders fiduciary obligations of

trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ModusLink in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ModusLink and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     Each officer and director of the Company owes to ModusLink and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

27.     In addition to their general fiduciary duties, the Audit Committee Defendants, Bay, Breen, Johnson, Jules, Mardy, and O'Donnell, owed and owe specific additional duties to ModusLink under the Company's Audit Committee Charter.  CMGI's Audit Committee Charter has been in effect since March 2004 and was modified in September 2008 when CMGI officially changed its name to ModusLink.  The Audit Committee duties include assisting the Board in monitoring the quality and integrity of the Company's financial statements, supervising the Company's compliance with legal and regulatory requirements, and policing the Company's internal controls and procedures.  According to the Audit Committee Charter, the following duties and responsibilities have been delegated by the Board to the Audit Committee Defendants:

> **Audited Financial Statements**
>
> 9. <u>Review and Discussion</u>. The ***Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements***, including the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

10. <u>Recommendation to Board Regarding Financial Statements</u>. ***The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K***.

\* \* \*

## Review of Other Financial Disclosures

12. <u>Independent Auditor Review of Interim Financial Statements</u>. ***The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards***. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

## Controls and Procedures

13. <u>Oversight</u>. ***The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct***. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

28.    These additional duties are delegated to the Audit Committee Defendants because they are assumed to have a heightened financial literacy.   The Audit Committee Charter specifically states that:

> ***Each member of the Audit Committee must be able to read and understand fundamental financial statements***, including the Company's balance sheet, income statement, and cash flow statement, at the time of his or her appointment to the Audit Committee. In addition, at least one member must have past employment experience in finance and accounting, or any other comparable experience or background which results in the individual's financial sophistication, including being or having been a chief executive officer, chief financial officer or other senior officer with financial oversight responsibilities. Unless otherwise determined by the Board of Directors (in which case disclosure of such determination shall be made in the Company's annual report filed with the SEC), ***at least one member of the Audit Committee shall be an "audit committee financial expert"*** (as defined by applicable SEC rules).

**Code of Business Conduct and Ethics**

29.     ModusLink displays on its website the Company's Code of Business Conduct and Ethics (the "Code").  The Code requires all of the Company's "directors, officers and employees" to comply with the Company's policies.  The Individual Defendants were and are subject to the Code.  The Code covers a wide range of business practices and procedures, which if violated, will subject those employees to severe disciplinary action, "up to and including discharge for cause."  Some of the business practices and procedures covered by the Code include:

> **Honest and Ethical Conduct and Fair Dealing**
>
> Employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. *Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice*.
>
> *   *   *
>
> **Accuracy of Books and Records and Public Reports**
>
> *Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports*. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.
>
> *All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies*. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.
>
> *It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure* in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

**Control, Access, and Authority**

30.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of ModusLink, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

31.     Because of their advisory, executive, managerial, and directorial positions with ModusLink, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of ModusLink.   While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company's business prospects.

32.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of ModusLink, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

33.     To discharge their duties, the officers and directors of ModusLink were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.   By virtue of such duties, the officers and directors of ModusLink were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how ModusLink conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breaches of Duties**

34.     Each Individual Defendant, by virtue of his or her position as an officer and/or director, owed and owe to the Company and to its shareholders the fiduciary duty of loyalty and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of ModusLink, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of ModusLink's Board.

35.     The Individual Defendants breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding its business prospects.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  Due to the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Actions.  As a result, ModusLink has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of ModusLink, regarding the Individual Defendants' management of ModusLink's operations and the prospects of the Company's business; and (ii) enhance the

Individual Defendants' executive and directorial positions at ModusLink and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

39.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and business prospects.

40.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## IMPROPER STATEMENTS

42.   The first improper statement was disseminated on September 25, 2007, when ModusLink issued a press release concerning its financial results for the 2007 fourth quarter and fiscal year, ending July 31, 2007.  In this press release, ModusLink announced the Company's key financial results, touting a "good fiscal year" relating to its reported net revenue, reported

operating income, and reported net income. These reported financial results were improper and lacked a reasonable basis when made because the press release omitted the fact that: (i) the Company's accounting for rebates associated with volume discounts provided by vendors was improper, misleading, and violated client contracts; (ii) the Company's financial statements did not provide a fair representation of the Company's finances and operations; and (iii) the Company's financial results were not prepared in accordance with GAAP. The press release stated in part:

> Waltham, Mass. -- September 25, 2007 CMGI, Inc. (Nasdaq: CMGI) today reported financial results for its fiscal 2007 fourth quarter and full year ended July 31, 2007.

> Fourth Quarter Financial Summary

> -- ***Net revenue of $252.6 million***, a decrease of 3.6% from the fourth quarter of the prior year.

> -- Gross margin, as a percentage of revenue, increased to 12.1% from 10.7% last year.

> -- ***Operating loss of $2.4 million*** compared with operating income of $1.7 million in the prior year.

> -- ***Net loss of $6.2 million*** or $0.01 per diluted share compared to net loss of $2.5 million or $0.01 per diluted share in the same period last year.

> -- Non-GAAP operating income of $7.2 million compared with $7.6 million in the fourth quarter of 2006.

> -- Cash, cash equivalents and marketable securities at July 31, 2007 increased to $282.3 million from $228.7 million at July 31, 2006.

43. The truth about the Company's improper accounting practices was not disclosed for almost five years. As such, the subsequent statements touting the Company's alleged success were all improper for the same reasons stated above. None of the reported net revenues, operating incomes, and net incomes were accurate. Instead, these figures were all overstated because they did not accurately reflect the Company's treatment of rebates associated with volume discounts by vendors. The following is a chart of improper press releases, Form 10-Ks, and Form 10-Qs disseminated by defendants:

| Filing Date | Filing Type | Signatures | Reported Net Revenue | Reported Operating Income | Reported Net Income |
|---|---|---|---|---|---|
| 9/25/2007 | Press Release | - | $252,560,000[1] $1,143,026,000 (Annual) | ($2,434,000) $14,765,000 (Annual) | ($6,204,000) $49,411,000 (Annual) |
| 10/15/2007 | 10-K | Lawler, Crane, Bay, Breen, Johnson, Jules, Lucente, and Mardy. **Sarbanes Oxley Act of 2002 ("SOX") CERTIFICATION:** Lawler and Crane. | $252,560,000 $1,143,026,000 (Annual) | ($2,434,000) $14,765,000 (Annual) | ($6,204,000) $49,411,000 (Annual) |
| 12/3/2007 | Press Release | - | $274,740,000 | $9,139,000 | $8,610,000 |
| 12/10/2007 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $274,740,000 | $9,139,000 | $8,610,000 |
| 3/10/2008 | Press Release | - | $277,972,000 | $8,601,000 | $27,803,000 |
| 3/11/2008 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $277,972,000 | $8,601,000 | $27,803,000 |
| 6/9/2008 | Press Release | - | $239,203,000 | $10,000 | ($2,559,000) |
| 6/9/2008 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $239,203,000 | $10,000 | ($2,559,000) |
| 9/29/2008 | Press Release | - | $276,292,000 $1,068,207,000 (Annual) | ($15,379,000) $2,371,000 (Annual) | ($22,727,000) $11,128,000 (Annual) |
| 10/14/2008 | 10-K | Lawler, Crane, Jules, Bay, Breen, Johnson, Lucente, and Mardy. **SOX CERTIFICATION:** Lawler and Crane. | $276,292,000 $1,068,207,000 (Annual) | ($17,379,000) $371,000 (Annual) | ($24,727,000) $9,128,000 (Annual) |
| 12/4/2008 | Press Release | - | $291,412,000 | ($10,794,000) | ($18,635,000) |
| 12/10/2008 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $291,412,000 | ($10,794,000) | ($18,635,000) |
| 3/10/2009 | Press Release | - | $260,461,000 | ($160,492,000) | ($168,775,000) |
| 3/12/2009 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $260,461,000 | ($160,492,000) | ($168,775,000) |
| 6/9/2009 | Press Release | - | $231,469,000 | $2,691,000 | ($1,947,000) |
| 6/9/2009 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $231,469,000 | $2,691,000 | ($1,947,000) |
| 9/29/2009 | Press Release | - | $225,211,000 $1,008,554,000 (Annual) | $902,000 ($167,693,000) (Annual) | ($4,094,000) ($193,452,000) (Annual) |

[1] Unless otherwise noted, financial figures refer to quarterly results.

| Date | Type | Signers / SOX Certification | | | |
|---|---|---|---|---|---|
| 10/14/2009 | 10-K | Lawler, Crane, Jules, Bay, Breen, Johnson, Lucente, and Mardy. **SOX CERTIFICATION:** Lawler and Crane. | $225,211,000 $1,008,554,000 (Annual) | $902,000 ($167,693,000) (Annual) | ($4,094,000) ($193,452,000) (Annual) |
| 12/7/2009 | Press Release | - | $246,678,000 | $11,555,000 | $8,558,000 |
| 12/10/2009 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $246,678,000 | $11,555,000 | $8,558,000 |
| 3/8/2010 | Press Release | - | $235,488,000 | $5,982,000 | $2,566,000 |
| 3/12/2010 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $235,488,000 | $5,982,000 | $2,566,000 |
| 6/8/2010 | Press Release | - | $213,697,000 | $1,295,000 | ($3,426,000) |
| 6/9/2010 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $213,697,000 | $1,295,000 | ($3,426,000) |
| 9/28/2010 | Press Release | - | $228,133,000 $923,996,000 (Annual) | ($25,760,000) ($6,927,000) (Annual) | ($25,485,000) ($17,787,000) (Annual) |
| 10/14/2010 | 10-K | Lawler, Crane, Jules, Bay, Breen, Johnson, Lucente, and Mardy. **SOX CERTIFICATION:** Lawler and Crane. | $228,133,000 $923,996,000 (Annual) | ($25,760,000) ($6,927,000) (Annual) | ($25,485,000) ($17,787,000) (Annual) |
| 12/6/2010 | Press Release | - | $236,379,000 | ($2,665,000) | ($6,670,000) |
| 12/10/2010 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $236,379,000 | ($2,665,000) | ($6,670,000) |
| 3/7/2011 | Press Release | - | $234,150,000 | ($26,324,000) | ($28,334,000) |
| 3/14/2011 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $234,150,000 | ($26,324,000) | ($28,334,000) |
| 6/7/2011 | Press Release | - | $207,140,000 | ($1,616,000) | ($5,126,000) |
| 6/9/2011 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $207,140,000 | ($1,616,000) | ($5,126,000) |
| 9/27/2011 | Press Release | - | $198,798,000 $876,466,000 (Annual) | ($4,367,000) ($34,972,000) (Annual) | ($8,885,000) ($49,015,000) (Annual) |
| 10/14/2011 | 10-K | Lawler, Crane, Breen, Fenton, Johnson, Jules, Lucente, Mardy, and O'Donnell. **SOX CERTIFICATION:** Lawler and Crane. | $198,798,000 $876,466,000 (Annual) | ($4,367,000) ($34,972,000) (Annual) | ($8,885,000) ($49,015,000) (Annual) |
| 12/5/2011 | Press Release | - | $206,151,000 | $2,638,000 | $1,599,000 |
| 12/12/2011 | 10-Q | Crane. **SOX CERTIFICATION:** Lawler and Crane. | $206,151,000 | $2,208,000 | $1,169,000 |
| 3/7/2012 | Press Release | - | $178,588,000 | ($13,469,000) | ($12,613,000) |

| | | Crane.<br>**SOX CERTIFICATION:** | | | |
|---|---|---|---|---|---|
| 3/12/2012 | 10-Q | Lawler and Crane. | $178,588,000 | ($13,469,000) | ($12,613,000) |

## THE TRUTH EMERGES

44.     The truth behind the Company's business health and the Individual Defendants' wrongdoing began to emerge on the morning of June 11, 2012, when the Company disclosed through a press release that it was the subject of an SEC inquiry into its accounting and financial reporting practices.  In response to the inquiry from the SEC regarding the Company's treatment of rebates associated with volume discounts provided by vendors, the Audit Committee of the Company's Board initiated an internal investigation, which determined that "certain" client contracts have not been aligned consistently with ModusLink's practice of retaining volume discounts. The Audit Committee also identified "limited instances" where vendor costs incurred were "marked-up" to clients in a manner not consistent with client contracts.

45.     The press release further stated that the Company believes it is no longer able to conclude that amounts from such volume discounts and mark-ups were correctly accounted for as revenue.  The Company announced that it expects to restate its audited financial statements from fiscal years 2009 through 2011, as well as the first two quarters of fiscal 2012 and its unaudited selected financial data for fiscal years 2007 and 2008, stating that the previously issued financial statements "***should no longer be relied upon***."  According to the press release, as a result of the restatement, "the Company expects to report downward adjustments to revenue of approximately $20 million to $30 million over a period in which aggregate reported revenue was $5.4 billion and aggregate reported net loss was $213 million, inclusive of $232 million of impairments related to goodwill and intangible assets."  The accounting and billing improprieties overstated the Company's pre-tax earnings by at least 30% to 45%.  Accordingly, the Company explained that it expects that the restatement will negatively impact net income.

46.     Due to the time required to review its current and historical financial data, ModusLink stated it was delaying the filing of its Form 10-Q for the third quarter of fiscal 2012 ended April 30, 2012.  As a result of this delay, the Company expects to receive a letter from The

NASDAQ Stock Market LLC ("NASDAQ") that it is not in compliance with NASDAQ listing rules.

47.     Finally, the press release disclosed that while the Company is continuing to assess the situation, it expects to conclude that the Company has a "***material weakness in its internal control over financial reporting***."  In the midst of these revelations, the June 11, 2012 press release also disclosed that the President and CEO, defendant Lawler, would be stepping down and also relinquishing his seat on the Board, effective immediately.  In addition, defendant McLennan, President of Global Operations would be departing.

48.     As part of defendant Lawler's Separation Agreement, he will receive: (i) a lump sum payment of $1,451,250 (which is equal to one year's base salary and his target bonus for 2012); and (ii) accelerated vesting in up to 66,010 options and 38,923 shares of restricted stock to the extent not otherwise vested upon his termination.  The Board breached its fiduciary duty to the Company by wasting its corporate assets and providing Lawler these undeserved benefits instead of terminating him for cause.

## DEFENDANTS' FALSE FINANCIAL REPORTING

49.     Throughout the relevant period, the Individual Defendants represented that the Company's financial statements were presented in conformity with GAAP. These representations were improper when made because the Individual Defendants, in violation of GAAP and SEC rules, knowingly and/or recklessly employed improper accounting and disclosure practices that materially misstated the financial results and position of ModusLink.

50.     Financial statements filed with the SEC are required to be in accordance with GAAP.  GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  ***SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate***, despite footnote or other disclosure.

51.     Defendants violated GAAP and SEC rules because the Company's financial statements were not prepared in conformity with applicable financial reporting requirements, nor

was the financial information a "fair presentation" of ModusLink's operations and financial position.  Defendants did so, by among other schemes, improperly recognizing revenues in a "manner not consistent with client contracts," not only in violation of their customer arrangements, but in violation of GAAP and SEC financial reporting guidelines.  Additionally, plaintiff believes that defendants will take full advantage of the inevitable restatement in order to clean-up additional accounting and disclosure improprieties which will result in further material adjustments to previously filed, and relied upon, financial results, statements, and disclosures.  Defendants allowed the Company to maintain a grossly inadequate system of internal controls over financial reporting riddled with material weaknesses.  Such lack of internal controls caused the Company's accounting and financial reporting improprieties noted herein.

52.     The accounting, disclosure, and internal control improprieties resulted in the material misstatement of the Company's revenues, gross profit, net income, and earnings per shares ("EPS") that were disseminated to the public and filed with the SEC.  Defendants have now admitted that the Company has, among other things, overstated its financial results.  As a result, the Individual Defendants have informed investors that they should no longer rely on previously issued financial statements for fiscal years 2009 through 2011, as well as the first two quarters of fiscal 2012 and its unaudited selected financial data for fiscal years 2007 and 2008.

53.     ModusLink's improper financial statements and disclosures were, and continue to be, included in its press releases on Forms 8-K, quarterly Forms 10-Q, annual Forms 10-K, and correspondence filed with the SEC.  The results, and the Individual Defendants' representations about them, were, and continue to be, improper when made, because ModusLink's financial statements and disclosures did not fairly present its results of operations and financial position in violation of numerous GAAP and SEC rules.

## ModusLink's Inevitable Restatement

54.     On June 11, 2012, ModusLink disseminated a press release disclosing that it was the subject of an SEC inquiry into its accounting and financial reporting practices.  In response to the inquiry from the SEC regarding the Company's treatment of rebates associated with volume discounts provided by vendors, the Audit Committee of the Company's Board initiated an

internal investigation, which determined that "certain" client contracts have not been aligned consistently with ModusLink's practice of retaining volume discounts.  Moreover, the Audit Committee also identified "limited instances" where vendor costs incurred were "marked-up" to clients in a manner not consistent with client contracts.  The Company concluded the press release by announcing that the Company expects to restate its audited financial statements from fiscal years 2009 through 2011, as well as the first two quarters of fiscal 2012 and its unaudited selected financial data for fiscal years 2007 and 2008, stating that the previously issued financial statements "***should no longer be relied upon***."

55.    The fact that ModusLink will restate its financial statements is an admission that:

(a)    the financial results originally issued, the certification of financial results, and public statements regarding ***those results were materially false and misleading***;

(b)    the financial statements reported were incorrect based on information available to the defendants at the time the results were originally reported; and

(c)    the financial statements and disclosures could no longer be relied on as being accurate.

56.    GAAP requires a restatement to occur when the originally issued financial statements were based on fraudulent accounting practices.  As set forth in Financial Accounting Standards Board ("FASB") Accounting Standards Codification 250, Accounting Changes and Error Corrections ("ASC 250"), the type of misstatements by ModusLink are for a "***correction of an error in previously issued financial statements***." ASC 250-10-5-4, defines an error in previously issued financial statements as "***an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared***."  Defendants' fraudulent accounting schemes meet the parameter of restatement requirements.

57.    The SEC has reiterated its position regarding Restatements.  The SEC often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order to:

*prove the falsity and materiality of the original financial statements/and/ to demonstrate that persons responsible for the original misstatements acted with scienter.*[2]

## Defendants' Fraudulent Accounting

58.     Defendants violated GAAP and SEC financial reporting guidelines and the Company's own publicly stated policy of accounting by incorrectly recording revenues associated with their scheme of billing their customers in excess of contracted terms.   The Company explained its revenue recognition policy in its fiscal 2011 Form 10-K filed with the SEC on October 14, 2011, stating:

> The Company's revenue primarily comes from the sale of supply chain management services to our clients. Amounts billed to clients under these arrangements include revenues attributable to the services performed as well as for materials procured on our clients' behalf as part of our service to them. Other sources of revenue include the sale of products and other services. Revenue is recognized for services when the services are performed and for product sales when the products are shipped assuming all other applicable revenue recognition criteria are met.

> The Company recognizes revenue in accordance with the provisions under the Accounting Standards Codification ("ASC") Topic 605, "Revenue Recognition" ("ASC Topic 605"). Specifically, the Company recognizes revenue when persuasive evidence of an arrangement exists, title and risk of loss have passed or services have been rendered, the sales price is fixed or determinable and collection of the related receivable is reasonably assured. The Company's standard sales terms are FOB shipping point, which means that risk of loss passes to the customer when it is shipped from the ModusLink location. The Company also evaluates the terms of each major client contract relative to a number of criteria that management considers in making its determination with respect to gross versus net reporting of revenue for transactions with its clients. Management's criteria for making these judgments place particular emphasis on determining the primary obligor in a transaction and which party bears general inventory risk. The Company records all shipping and handling fees billed to clients as revenue, and related costs as cost of sales, when incurred.

---

[2] *In re Sunbeam Sec. Litig.*, 98-8258-Civ .-Middlebrooks (S .D. Fla. Jan . 31, 2002), Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (www.sec.gov/litigation/briefs/sunbeam.htm).

59.     The most basic accounting guidance on revenue recognition is addressed by the FASB, which states that revenue should only be recognized when it is both *earned* and either *realized or realizable*.[3]   SFAC No. 5 ¶84(a) states in part that "two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)."   Additionally, SFAC No. 5 ¶83(b) states that "[a]n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."   Defendants knowingly ignored the basic premise of SFAC No. 5 when they allowed the Company to recognize revenues associated with overbilling certain of its customers as such revenues were not realized or earned.   Recognizing revenue associated with overbilling customers does not constitute realizable or earned revenue transactions in accordance with GAAP.

60.     Further, GAAP[4] and SEC[5] guidelines mandate that in order to recognize revenue, there must be: (i) persuasive evidence that an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and, (iv) collectability is reasonably assured.   Such guidance further requires that persuasive evidence of an arrangement be a contract signed by both parties, where the vendor has a customary business practice of utilizing written contracts.   Defendants' scheme to fraudulently bill the Company's

---

[3] *See* FASB Concept No. 5, Recognition and Measurement in Financial Statements of Business Enterprises ("SFAC No. 5").

[4] FASB, Accounting Standards Codification 605, Revenue Recognition.

[5] SEC Staff Accounting Bulletin ("SAB") Topic 13.   SAB Topic 13 represents the codification of certain SABs, including SAB No. 101 (and No. 104), Revenue Recognition in Financial Statements as of May 9, 2003.   On December 17, 2003, SAB Topic 13 was revised by SAB No. 104, Revenue Recognition.

customers in excess of contractual arrangements enabled the Company to improperly recognize revenues on transactions that were **unsupported by persuasive evidence** and for which the corresponding agreed-to prices were **not fixed or determinable**. Accordingly, certain of the Company's customers paid for services and product that were **never delivered** or provided by the Company, further violating requisite revenue recognition guidelines.

## Defendants' Misstatements Were Material

61.     The Individual Defendants' accounting and disclosure violations were material. Defendants loosely warned the Company's shareholders in the June 11, 2012 press release, that they expect the impact of the imminent restatement to have a $20 million to $30 million negative impact to cumulative revenues from fiscal 2007 through the second quarter of fiscal 2012 (the "Restatement Period"). Defendants attempt to minimize this impact to the forthcoming restatement by comparing the expected negative impact to their Restatement Period revenues of $5.4 billion. Defendants fail, however, to address the true materiality of their wrongdoing. Excluding cumulative impairment losses of $232 million, the Company's Restatement Period pre-tax earnings totaled $66.9 million. Accordingly, the accounting and billing improprieties overstated the Company's Restatement Period pre-tax earnings by at least 30% to 45%, which is deemed material from both a qualitative and quantitative standpoint.

62.     The SEC clarifies the principles of materiality in SAB Topic 1M, Materiality[6]. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." SAB Topic 1M also stresses that materiality requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

63.     SAB Topic 1M further states:

---

[6] SAB Topic 1M, Materiality, represents the codification of certain SABs, including SAB No. 99, Materiality, as of May 9, 2003. SAB No. 99 was effective August 12, 1999.

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are —

- Whether the misstatement masks a change in earnings or other trends.

- Whether the misstatement changes a loss into income or vice versa.

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

- Whether the misstatement has the effect of increasing management's compensation — for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation.

The Individual Defendants' misstatements discussed herein satisfy each of the above criteria and were, and are, material from both a quantitative and qualitative perspective.

## Additional GAAP and SEC Violations

64.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

(a)     The principle that interim financial reporting shall be based upon the same accounting principles and practices used by an entity in the preparation of its latest annual financial statements (ASC 270-45-2);

(b)     The principle that "[f]inancial reporting should provide information that is useful to present [to] potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

(c)     The principle that "[f]inancial reporting should provide information about the economic resources of an enterprise, the claims to those resources, … and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, 40);

(d)     The principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

(e)     The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners

(stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

    (f)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, 58-59);

    (g)  The principle that completeness, meaning that "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions" (FASB Statement of Concepts No. 2, 79); and

    (h)  The principle that "[c]onservatism [be used as] a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" (FASB Statement of Concepts No. 2, 95).

## THE IMPROPER REPURCHASES

   65.  While the Individual Defendants made improper statements and failed to disclose material facts that had the effect of maintaining the Company stock artificially inflated, defendants Jules, Breen, Mardy, Lucente, and Johnson authorized and implemented multiple repurchases of the Company's stock at these artificially inflated rates. Despite knowing or recklessly disregarding the fact that the value of the Company was inflated due to improper statements regarding the Company's financial results and impending remediation responsibilities to clients, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.

   66.  From September 2007 to March 2011, defendants Jules, Breen, Mardy, Lucente, and Johnson caused the Company to repurchase approximately 5,792,924 shares of its stock at a staggering aggregate cost to the Company of over $56 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose that: (i) the Company's accounting for rebates associated with volume discounts provided by vendors was inaccurate and misleading; (ii) the Company's financial statements did not provide a fair representation of the Company's finances and operations; and (iii) as a result, the Company's financial results were not prepared in accordance with GAAP.

67.     Despite Jules, Breen, Mardy, Lucente, and Johnson's knowledge of the true facts about the Company's overstated financial results and impending remediation responsibilities, they did not halt the Company's purchases and continued to allow the Company to purchase shares at artificially inflated prices. Jules, Breen, Mardy, Lucente, and Johnson's decision was not the product of a valid business judgment.

68.     Under Jules, Breen, Mardy, Lucente, and Johnson's purview, the Company bought back its shares at a weighted average price of $9.77.  Tellingly, the weighted average repurchase price was substantially higher than ModusLink's share price of $2.78 on June 11, 2012, when the Company's true business health was revealed.  The following chart illustrates the average prices paid for the Company's common stock during the repurchase period:

| Program | Period | Shares Repurchased | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|---|
| September 2007 Repurchase ($50 Million Authorized ) | September 2007 - January 2009 | - | - | - | - | 8K | 9/25/2007 |
| | September 2007 | - | - | - | - | 10Q | 12/10/2007 |
| | October 2007 | 568,000 | $14.10 | $1.38 | $8,008,800.00 | 10Q | 12/10/2007 |
| | November 2007 | 178,500 | $11.82 | $0.36 | $2,109,870.00 | 10Q | 3/11/2008 |
| | December 2007 | 59,500 | $11.69 | $0.12 | $695,555.00 | 10Q | 3/11/2008 |
| | January 2008 | 269,044 | $11.86 | $0.55 | $3,190,861.84 | 10Q | 3/11/2008 |
| | February 2008 | 195 | $11.77 | $0.00 | $2,295.15 | 10Q | 6/9/2008 |
| | March 2008 | 114,153 | $11.48 | $0.23 | $1,310,476.44 | 10Q | 6/9/2008 |
| | April 2008 | - | - | - | - | 10Q | 6/9/2008 |
| | May 2008 | - | - | - | - | 10K | 10/14/2008 |
| | June 2008 | 827,000 | $11.36 | $1.62 | $9,394,720.00 | 10K | 10/14/2008 |
| | July 2008 | 967,462 | $10.90 | $1.82 | $10,545,335.80 | 10K | 10/14/2008 |
| | August 2008 | - | - | - | - | 10Q | 12/10/2008 |
| | September 2008 | - | - | - | - | 10Q | 12/10/2008 |
| | October 2008 | 477,851 | $6.24 | $0.51 | $2,981,790.24 | 10Q | 12/10/2008 |
| | November 2008 | - | - | - | - | 10Q | 3/12/2009 |
| | December 2008 | - | - | - | - | 10Q | 3/12/2009 |
| | January 2009 | - | - | - | - | 10Q | 3/12/2009 |

| | | | | | | |
|---|---|---|---|---|---|---|
| June 2009 Repurchase ($15 Million Authorized) | June 2009 - April 2010 | - | - | - | - | 8K | 6/8/2010 |
| | June 2009 | 285,100 | $6.64 | $0.33 | $1,893,064.00 | 10K | 10/14/2009 |
| | July 2009 | 280,232 | $6.81 | $0.33 | $1,908,379.92 | 10K | 10/14/2009 |
| | August 2009 | 21,810 | $7.12 | $0.03 | $155,287.20 | 10Q | 12/10/2009 |
| | September 2009 | - | - | - | - | 10Q | 12/10/2009 |
| | October 2009 | 277,000 | $8.38 | $0.40 | $2,321,260.00 | 10Q | 12/10/2009 |
| | November 2009 | 201,472 | $8.29 | $0.29 | $1,670,202.88 | 10Q | 3/12/2010 |
| | December 2009 | 323,301 | $9.29 | $0.52 | $3,003,466.29 | 10Q | 3/12/2010 |
| | January 2010 | 183,325 | $9.74 | $0.31 | $1,785,585.50 | 10Q | 3/12/2010 |
| | February 2010 | 137,500 | $9.71 | $0.23 | $1,335,125.00 | 10Q | 6/9/2010 |
| | March 2010 | 95,365 | $9.53 | $0.16 | $908,828.45 | 10Q | 6/9/2010 |
| | April 2010 | - | - | - | - | 10Q | 6/9/2010 |
| June 2010 Repurchase ($10 Million Authorized) | June 2010 - March 2011 | - | - | - | - | 8K | 6/8/2010 |
| | June 2010 | 55,800 | $6.38 | $0.06 | $356,004.00 | 10K | 10/14/2010 |
| | July 2010 | 254,800 | $6.42 | $0.28 | $1,635,816.00 | 10K | 10/14/2010 |
| | August 2010 | 103,814 | $6.25 | $0.11 | $648,837.50 | 10Q | 12/10/2010 |
| | September 2010 | 93,400 | $6.68 | $0.11 | $623,912.00 | 10Q | 12/10/2010 |
| | October 2010 | 18,300 | $6.45 | $0.02 | $118,035.00 | 10Q | 12/10/2010 |
| | November 2010 | - | - | - | - | 10Q | 3/14/2011 |
| | December 2010 | - | - | - | - | 10Q | 3/14/2011 |
| | January 2011 | - | - | - | - | 10Q | 3/14/2011 |
| | February 2011 | - | - | - | - | 10Q | 6/9/2011 |
| | March 2011 | - | - | - | - | 10Q | 6/9/2011 |
| | | 5,792,924 | | $9.77 | $56,603,508 | | |

69.     Because the price of ModusLink's shares was artificially inflated by way of the Individual Defendants' concealment and misrepresentations, the Company materially overpaid for its own stock.  The stock purchases falsely signaled to ModusLink's shareholders and the public that the purchase of the Company's stock at those prices was the best use of ModusLink's cash.  Thus, defendants Jules, Breen, Mardy, Lucente, and Johnson breached their fiduciary duties and committed corporate waste by causing ModusLink to purchase over $56 million of its own shares at artificially inflated prices.

**DAMAGES TO MODUSLINK**

70.     As a result of the Individual Defendants' improprieties, ModusLink disseminated improper, public statements concerning the Company's financial results.   These improper statements have devastated ModusLink's credibility as reflected by the Company's over $65 million, or 35%, one-day market capitalization loss.

71.     Further, as a direct and proximate result of the Individual Defendants' actions, ModusLink has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

(a)     costs incurred in responding to the SEC inquiry into the Company's accounting and financial reporting practices;

(b)     costs incurred from repurchasing over $56 million of the Company's own stock at artificially inflated prices;

(c)     costs incurred due to the Company's potential breaches of contract due to instances where vendor costs were "marked-up" to clients in a manner not consistent with client contracts;

(d)     costs incurred due to the Company's need to restate its previous financial statements;

(e)     costs incurred in investigating and defending ModusLink and certain officers and directors in the Securities Class Actions;

(f)     costs incurred from paying any potential settlement or adverse judgment in the Securities Class Actions; and

(g)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to ModusLink.

72.     Moreover, these actions have irreparably damaged ModusLink's corporate image and goodwill.   For at least the foreseeable future, ModusLink will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that ModusLink's ability to raise equity capital or debt on favorable terms in the future is now impaired.   Furthermore,

ModusLink's reputation and/or relationship with its clients has been harmed, which may adversely affect the Company's future business.

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.     Plaintiff brings this action derivatively in the right and for the benefit of ModusLink to redress injuries suffered, and to be suffered, by ModusLink as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  ModusLink is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

74.     Plaintiff will adequately and fairly represent the interests of ModusLink in enforcing and prosecuting its rights.

75.     Plaintiff was a shareholder of ModusLink at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current ModusLink shareholder.

76.     The current Board of ModusLink consists of the following seven individuals: defendants Breen, Fenton, Jules, Lucente, Mardy, O'Donnell, and non-defendant Jeffrey S. Wald. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because a Majority of the Current Board Face a Substantial Likelihood of Liability for Their Misconduct**

77.     The entire current Board breached its fiduciary duty to the Company by wasting its corporate assets and providing defendant Lawler the undeserved benefits included in his Separation Agreement, instead of terminating him for cause.  The Company includes "…gross negligent or willful misconduct by the Executive in connection with his employment duties…" as a basis for termination for cause.  As alleged herein, Lawler, with at least gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) failed to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (iii) failed to implement adequate

internal controls and procedures to ensure client transactions complied with contractual terms. Moreover, instead of prosecuting Lawler for his misconduct, the Board is providing Lawler with the benefit of "continuation of indemnity" as part of his Separation Agreement, which means that he will be protected from "…any possible claim or threatened, pending or completed action, suit or proceeding, whether civil, criminal or investigative…."  Accordingly, any demand upon the Board is futile.

78.     As explained above, defendants Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell breached their fiduciary duty of loyalty by making improper statements in the Company's SEC filings regarding the Company's financial results.

79.     Defendants Breen, Jules, Lucente, and Mardy's multiple authorizations of repurchases of the Company's stock at artificially inflated rates were not protected business decisions.  Breen, Jules, Lucente, and Mardy knew or recklessly disregarded the fact that the value of the Company was inflated due to improper statements regarding the Company's reported financial results, and yet directed or permitted the Company to materially overpay for its own stock.

80.     Defendants Breen, Jules, Mardy, and O'Donnell, as members of the Audit Committee, reviewed and approved the improper statements regarding the Company's reported financial results.  The Audit Committee's Charter provides that it is responsible for assisting the Board in monitoring the quality and integrity of the Company's financial statements, supervising the Company's compliance with legal and regulatory requirements, and policing the Company's internal controls and procedures.  Thus, Breen, Jules, Mardy, and O'Donnell are responsible for knowingly or recklessly allowing the improper statements relating to the Company's reported financial results, and the true nature and extent of remediation efforts needed by the Company to respond to potential breaches of contract with its customer base.  Moreover, Breen, Jules, Mardy, and O'Donnell reviewed and approved the improper press releases made to the public.  Despite their knowledge, or with reckless disregard, the Audit Committee Defendants caused, and additionally in some instances signed, these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they

participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

81.     Defendants Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell breached their duty of loyalty by causing the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's disclosures and financial statements.  Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell also failed to prevent the other Individual Defendants from committing this wrongdoing.  As a result of Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell's course of conduct, the Company is now the subject of the Securities Class Actions.

82.     Defendants Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell also breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to fail to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.  As a result of Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell's course of conduct, the Company is now facing potential liability due to instances where vendor costs were "marked-up" to clients in a manner not consistent with client contracts. Due to Breen, Fenton, Jules, Lucente, Mardy, and O'Donnell's mismanagement, the Company has been forced to interrupt its business and dedicate it resources and attention to remediating the Company's potential breaches of contract.

83.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by ModusLink's officers and directors and these acts are incapable of ratification.

84.     ModusLink has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ModusLink any part of the damages ModusLink suffered and will suffer thereby.

85.     If ModusLink's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this

Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of ModusLink. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by ModusLink against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause ModusLink to sue themselves or certain of the officers of ModusLink, there would be no directors and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause ModusLink to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

86.    Moreover, despite having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recovery for ModusLink for any of the wrongdoing alleged by plaintiff herein. There is no evidence that the Board even subjected any of the Individual Defendants to disciplinary action, as required by the Company's own Code.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

87.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.    The Individual Defendants owed and owe ModusLink fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe ModusLink the highest obligation of good faith, fair dealing, loyalty, and due care.

89.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within ModusLink, and/or

consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

90.     The Officer Defendants, Lawler, Crane, and McLennan, knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and/or (iii) breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to fail to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms.

91.     The Director Defendants, Bay, Breen, Fenton, Johnson, Jules, Lucente, O'Donnell, and Mardy, as directors of the Company, owed ModusLink the highest duty of loyalty.  The Director Defendants knowingly or recklessly breached their duty of loyalty by: (i) making improper statements in the Company's press releases and public filings concerning the Company's financial results; (ii) allowing defendants to cause, or by themselves causing, the Company to fail to implement adequate internal controls and procedures to ensure the accuracy of the Company's financial reporting; and (iii) breached their duty of loyalty by allowing defendants to cause, or by themselves causing, the Company to fail to implement adequate internal controls and procedures to ensure client transactions complied with contractual terms. Furthermore, Jules, Breen, Bay, Mardy, Lucente, and Johnson knowingly or recklessly breached their duty of loyalty by authorizing and implementing multiple improper repurchases of the Company's stock at artificially inflated rates.

92.     The Audit Committee Defendants, Bay, Breen, Johnson, Jules, Mardy, and O'Donnell, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and Bay, Breen, Johnson, Jules, Mardy,

and O'Donnell failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ModusLink has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

94.     Plaintiff, on behalf of ModusLink, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

95.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

96.     As a result of the misconduct described above, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in purchasing artificially inflated ModusLink stock and defending itself in the Securities Class Actions that they brought on with their improper statements.  In addition, due to the Individual Defendants' mismanagement, the Company has been forced to interrupt its business and dedicate its resources and attention to remediating the Company's potential breaches of contract due to instances where vendor costs were "marked-up" to clients in a manner not consistent with client contracts. Finally, by failing to conduct proper supervision, the Individual Defendants have caused ModusLink to waste its assets by paying improper compensation to certain of its executive officers and directors that breached their fiduciary duty.

97.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

98.     Plaintiff, on behalf of ModusLink, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ModusLink.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to ModusLink.

101.    Plaintiff, as a shareholder and representative of ModusLink, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

102.    Plaintiff, on behalf of ModusLink, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of ModusLink, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing ModusLink to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ModusLink and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a proposal to cure the Company's "material weakness in its internal control over financial reporting," a deficiency disclosed in the June 11, 2012 press release;

2.      a proposal to strengthen the Company's disclosure controls and procedures;

3.      a proposal to regulate the Board's future authorizations of stock repurchases;

       4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

       5.      a provision to permit the shareholders of ModusLink to nominate at least three candidates for election to the Board;

       C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of ModusLink has an effective remedy;

       D.      Awarding to ModusLink restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by defendants;

       E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 31, 2012

HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP

/s/Theodore M. Hess-Mahan
THEODORE M. HESS-MAHAN
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Telephone: (781) 431-2231
Facsimile: (781) 431-8726
thess-mahan@hutchingsbarsamian.com

THE WARNER LAW FIRM
PAUL T. WARNER
11123 McCracken Circle, Suite A
Cypress, TX  77429
Telephone:  (281) 664-7777
Facsimile:  (281) 664-7774
pwarner@warner-law.net

Attorneys for Plaintiff

753977